**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Plaintiff-Appellee,**

v.

**Leroy JACKSON, Defendant-Appellant.**

**Nos. 85–2583, 85–2690.**

United States Court of Appeals,
Fifth Circuit.

July 15, 1987.

Rehearing En Banc Granted
July 15, 1987.

Richard Schechter, Schechter, Eiseman & Solar, Houston, Tex., for defendant-appellant.

Reagan Wm. Simpson, Houston, Tex., Arthur R. Miller, Cambridge, Mass., Steven Lynn Roberts, Stephen Pate, Fulbright & Jaworski, Houston, Tex., for plaintiff-appellee.

Before BROWN, REAVLEY and JONES, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case lies at the point where federalism and the Anti-Injunction Act intersect with preemption and the Declaratory Judgment Act. The question is whether the Longshore and Harbor Workers Compensation Act (LHWCA) preempts a state law cause of action for the bad faith withholding of compensation benefits. We affirm the District Court's declaratory judgment that the LHWCA is preemptive, but reverse the injunction staying the state court proceedings.

### A Tale of Two Lawsuits

Appellant Leroy Jackson, an employee covered by the LHWCA, 33 U.S.C. §§ 901–950, injured his back and right ankle on July 12, 1978 while in the employ of Gulfport Shipbuilding Company in Port Arthur, Texas. Jackson received medical treatment and returned to work on October 30 of that year. During the following three and one-half years, Jackson continued at his shipfitting duties but occasional recurring bouts of back pain related to his July 1978 accident forced him periodically to seek additional medical treatment. Four times between October 1978 and May 1982, Jackson received medical treatment for his back condition and was absent from work for periods ranging from about six to about fifteen weeks.

At the time of Jackson's injury, Gulfport Shipbuilding was an employer subject to the LHWCA. As Gulfport's LHWCA carrier, Texas Employers' Insurance Association (TEIA) paid for Jackson's medical treatment and paid him temporary total disability benefits during those periods when Jackson was unable to work.

On May 3, 1982, Jackson seriously reinjured his back while at work and has not returned to work since. On July 6, 1982, Jackson filed a formal claim for permanent disability benefits. *See* 33 U.S.C. § 908. Shortly thereafter, on July 23, TEIA filed

the first of several formal controversies,[1] this one on the basis that Jackson had not yet reached maximum medical improvement, and thus it was unknown whether his disability would indeed be permanent. Despite its filing of the controversion, TEIA did not suspend payment of Jackson's benefits until April 4, 1983.

On July 6, 1983, in an informal conference before the Deputy Commissioner, TEIA agreed to, and did, resume Jackson's payments. Jackson was re-examined by a physician in mid-August 1983, and on September 14, TEIA again filed a controversion and suspended Jackson's benefits, this time on the stated basis that Jackson's disability was due to a continuing arthritic condition and not the result of his 1978 back injury. On September 28, 1983, a second informal conference was held, this time before a Claims Examiner. The next day, September 29, TEIA filed a third controversion, here challenging the Claims Examiner's recommendation for payment of compensation. As provided under the Act, 33 U.S.C. § 919, Jackson's claim went to a formal hearing before an ALJ on May 3, 1984.

### Jackson Goes to the State Court

On June 5, 1984, while the decision of the ALJ was pending, Jackson filed a lawsuit against TEIA [2] in Texas state court. Jackson's original petition contained seven causes of action generally alleging bad faith insurance practices on the part of TEIA, and it requested $1.5 million in actual damages and $15 million in punitive damages. TEIA answered the lawsuit, and extensive discovery ensued.

On September 14, 1984, the ALJ who heard Jackson's claim issued a final decision and order declaring Jackson to be totally and permanently disabled and ordered payment of compensation benefits, attorney's fees, and interest on all past unpaid amounts. Neither party appealed the ALJ's decision and the order became final. *See* 33 U.S.C. § 921.

Even though the ALJ had decided his claim favorably, Jackson nevertheless pressed on with the state court case. In January 1985, the state trial court denied TEIA's plea in bar, which had asserted that Jackson's state claims were barred by the exclusivity provisions of the LHWCA.

### TEIA Goes to the Federal Court

In June 1985, TEIA filed the instant suit in federal district court. TEIA sought two declaratory judgments: (i) the LHWCA preempted Jackson's state bad faith insurance practices action and (ii) the ALJ's decision was res judicata with respect to Jackson's challenge to the manner in which TEIA handled his LHWCA claim. TEIA also sought an injunction prohibiting Jackson from proceeding with his state action. In August 1985, the District Court enjoined Jackson from further proceeding in state court. In September 1985, the District Court entered a subsequent order, permanently enjoining Jackson from prosecuting his state court suit and declaring that the LHWCA preempts the state law causes of action arising from the handling of compensation payments under the Act. 618 F.Supp. 1316 (E.D.Tex.1985). The state trial remains stayed. Jackson appeals.

---

**1.** A controversion is the statutory challenge to a claim for benefits made under the LHWCA. *See* 33 U.S.C. § 914(d).

If the employer does not believe that an employee is eligible for benefits under the Act, Section 14(a) [33 U.S.C. § 914(a)] relieves him of the obligation to begin making compensation payments so long as he promptly controverts the claim. The employer must file a U.S. Department of Labor ... form ... on or before the fourteenth day after he receives notice or has knowledge of the alleged injury or death. The notice must state the names of the claimant and employer, the date

of injury or death and the reasons for controverting the right to compensation.
1A *Benedict on Admiralty* § 77c (6th ed. 1986) (footnotes omitted).

**2.** The LHWCA equates employers and their insurance carriers for purposes of the Act. 33 U.S.C. § 935; *see also* 20 C.F.R. § 703.115. In this opinion, we shall refer in some places to employers, in others to insurers, and in yet others to both, but for the purposes of our discussion, it is not necessary to distinguish between them.

## The Preeminence of Preemption

We first consider whether Jackson's state law claims are preempted by the LHWCA. Federal law will be found to preempt state law in three different instances. First, Congress may explicitly express its intent to preempt state law. *Shaw v. Delta Air Lines*, 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490, 500 (1983). Second, Congress' intent to displace state law may be inferred, generally through the comprehensiveness or pervasiveness of the federal regulatory scheme. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947). Finally, even where Congress has not entirely displaced state law, federal law will nevertheless preempt state law when state law conflicts with federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963), or when state law interferes with the accomplishment and execution of the congressional purpose, *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941). *See Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399, 406 (1984) (summarizing three types of preemption). Although any one of these three bases would be sufficient to establish preemption, we agree with the District Court that, on all of these bases, the LHWCA preempts the Texas state law invoked by Jackson.

### (i) Congressional Intent to Preempt

With respect to explicit congressional intent to preempt state law, we look to § 5(a) of the Act, 33 U.S.C. § 905(a), which provides that the employer's liability "shall be exclusive and in place of all other liability of such employer." The liability referred to in this section arguably refers only to the employer's liability for medical treatment, compensation benefits for disability, and death, *see* 33 U.S.C. §§ 904, 907, 908, 909, but in light of the carefully crafted and comprehensive statutory compensation scheme contained in the LHWCA, we read § 5 broadly as an indication of Congress' intent to preempt state law that significantly conflicts with any portion of the Act, including the payment of compensation benefits, the provision of medical care, and the timing of such payments. *See Sample v. Johnson*, 771 F.2d 1335, 1346–47 (9th Cir.1985) (§ 5(a)'s preemptive effect should be construed broadly in light of the traditional interpretation lent to workers compensation statutes), *cert. denied*, —— U.S. ——, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986); *Hall v. C & P Telephone Co.*, 793 F.2d 1354 (D.C.Cir.1986) (LHWCA is preemptive and bars any court from taking jurisdiction of independent civil tort claims), *citing Garrett v. Washington Air Compressor Co.*, 466 A.2d 462 (D.C.1983).

### (ii) Comprehensiveness of Federal Scheme

Federal law will also preempt state law if the sheer comprehensiveness of the federal regulatory scheme warrants the inference of congressional intent to preempt. The LHWCA,[3] born of much judicial travail and contention among the states, Congress, and the Supreme Court,[4] was established as a uniform national program of workers compensation benefits for longshore and harbor workers which could not be constitutionally provided by the States. The program is administered by the Secretary of Labor through the Director of Office of Workers' Compensation Programs. 33 U.S.C. § 939. It is routinely handled by regional Deputy Commissioners, who no longer have any adjudicative duties or powers. Controverted cases are now heard by an ALJ. Appeals of compensation orders

---

**3.** The Act was substantially amended in 1972 and again in 1984. *See* LHWCA Amendments of 1972, Pub.L. 92–576, 86 Stat. 1251, and LHWCA Amendments of 1984, Pub.L. 98–426, 98 Stat. 1639.

**4.** The story has been many times told. *See, e.g., Southern P. Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); *Washington v. Dawson & Co.*, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924); *Panama R.R. Co. v. Johnson*, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924).

are handled first by a review board in the Department of Labor, 33 U.S.C. § 921, and then by federal courts of appeals, 33 U.S.C. § 921(c). Unlike their former role as the first step in appellate review, federal district courts now are confined to enforcing compensation orders. 33 U.S.C. §§ 918, 921(d). Unlike many workers compensation acts that require repeated court enforcement, the LHWCA is almost self-executing, self-policing.

Thus, of great significance for this case, the LHWCA provides for automatic payment of benefits, and further provides for express penalties for an employer's failure to pay benefits. 33 U.S.C. §§ 914, 938. Under the authority of the LHWCA, the Secretary of Labor has promulgated a detailed set of regulations implementing all portions of the Act. *See* 20 C.F.R. §§ 701–704 (1980). Portions of these regulations are directed specifically toward carriers that issue LHWCA insurance. *See* 20 C.F.R. §§ 703.101–703.503 (1980). In a nutshell, it is difficult to imagine a more comprehensive scheme of federal regulation—one that leaves no room for state involvement—than that contained in the LHWCA.

### (iii) State Law Conflicts with Federal Law

The third instance in which federal law will be found to preempt state law occurs when state law either conflicts with federal law or interferes with the accomplishment or execution of the purpose behind federal law. In this case, we believe that the intrusion of a state tort claim would interfere with the regulatory program established by Congress.

Recognition of such state claims would inject numerous conflicting "bad faith" standards into an otherwise uniform national system. In addition, such claims would interfere with the penalty provisions that Congress included in the LHWCA. Section 14(a) of the Act, 33 U.S.C. § 914(a) provides that "[c]ompensation under this chapter shall be paid periodically, promptly, and directly to the person entitled thereto, without an award, *except where liability to pay compensation is controverted by the employer*" (emphasis added). Section 14(e), 33 U.S.C. § 914(e), further provides that

> [i]f any installment of compensation payable without an award is not paid within fourteen days after it becomes due, ... there shall be added to such unpaid installment an amount equal to 10 per centum thereof, which shall be paid at the same time as, but in addition to, such installment, *unless notice is filed under subsection (d) of this section* [the controversion section]....[5]

(Emphasis added). Thus, where the employer controverts a claim, it is expressly relieved from paying either the disputed compensation or the 10% penalty for nonpayment.

### Controversy over Controversion

Significantly, both before and after the enactment of the 1984 LHWCA amendments,[6] Congress rejected serious proposals to impose expressly an obligation of good faith on the right to file a controversion and to create a specific cause of action for wrongful controversion. In response to repeated complaints by organized labor about arbitrary controversions, Congress (although rejecting these more extreme measures), in 1984 added a provision to the LHWCA creating criminal penalties for the fraudulent denial of benefits, *see* 33 U.S.C. § 931(c) (providing for a fine of up to $10,000 and for imprisonment for up to five

---

**5.** Once a claimant has been found entitled to compensation, additional penalties are sanctioned under the LHWCA:

> If any compensation, payable under the terms of an award, is not paid within ten days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 per centum thereof, which shall be paid at the same time as, but in addition to, such compensation, unless review of the compensation

order making such award is had as provided in section 921 of this title and an order staying payment has been issued by the Board or court.

33 U.S.C. § 914(f).

**6.** Jackson's claim arose before the enactment of the 1984 amendments (see note 3 *supra*) and is thus governed by the pre–1984 version of the LHWCA.

years for knowingly making a false statement in order to reduce, deny, or terminate benefits). Nevertheless, in the face of these pressures, Congress, in its 1984 amendments, left unchanged the unfettered right of the employer to file the formal controversion which automatically permits the carrier to suspend compensation benefits. While ordinarily inferring pre–1984 intent from what Congress did or did not do in 1984 is a doubtful undertaking, the very issues of unreasonable controversions by employers and the asserted necessity of sanctions to prohibit or prevent them were before Congress as it considered its extensive 1984 Amendments to the LHWCA. This legislative history demonstrates at least that Congress was willing to leave the structure as it was, by which the right to file a formal controversion is unconditioned, subject only to severe criminal penalties for making a false statement in conjunction with such a controversion. *See generally Longshoremen's and Harbor Workers' Compensation Act Amendments of 1981: Hearings on S. 1182 Before the Subcomm. on Labor of the Senate Comm. on Labor and Human Resources,* 97th Cong., 1st Sess. 433 (1981).

*Help from § 301 and Lueck*

Our conclusion that Jackson's state tort claims are preempted by the LHWCA is supported by the recent Supreme Court decision in *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). In *Lueck,* an employee brought in state court a common law tort claim for bad faith failure to pay disability benefits against his employer and his employer's insurer. The employee complained that both defendants had intentionally and repeatedly failed to make disability payments to him under a disability plan negotiated as part of a collective bargaining agreement by the employer and the employee's union. The Wisconsin Supreme Court held that the employee's action could proceed in state court. The Supreme Court granted certiorari to determine whether § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), preempted the state tort claim.

The Supreme Court held that the state claim was preempted. The Court emphasized the importance of national uniformity in giving meaning to the terms of collective bargaining agreements. "Unless federal law governs that claim, the meaning of the health and disability-benefit provisions of the labor agreement would be subject to varying interpretations, and the congressional goal of a unified federal body of labor-contract law would be subverted." *Lueck,* 471 U.S. at 220, 105 S.Ct. at 1916, 85 L.Ed.2d at 221; *see also Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). "[I]t is a question of federal contract interpretation whether there was an obligation under this contract to provide the payments in a timely manner, and, if so, whether [the employer's] conduct breached that implied contract provision." *Lueck,* 471 U.S. at 215, 105 S.Ct. at 1913, 85 L.Ed.2d at 218. The Court also rejected the employee's claim that, characterizing his suit as one grounded in tort rather than in contract, was sufficient to remove it from the LMRA's preemptive reach.

[Q]uestions relating to what the parties to a labor agreement agree, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* at 211, 105 S.Ct. at 1911, 85 L.Ed.2d at 215. Finally, the Court asserted that its holding was necessary to preserve the role of arbitration in labor-management relations. Allowing employees to bypass the grievance procedure by going directly to state court would subvert the mediation process and "eviscerate a central tenet of federal labor-contract law." *Id.* at 220, 105 S.Ct. at 1916, 85 L.Ed.2d at 221.

Although the Supreme Court purported not to decide whether a state bad faith failure to pay a tort claim would be preempted by "other federal laws governing employment or benefit plans," the reasoning in *Lueck* is just as compelling, if not more so, when applied to the situation of

the instant case. In the LHWCA, Congress established a nationwide compensation program with precise mechanisms for the provision and payment of benefits, the handling of controversies over payment, and the penalties for nonperformance. We are no more willing to allow state court tort law to intrude upon this uniform federal compensation program than the Supreme Court was inclined to allow state court tort law to intrude upon a federally controlled collective bargaining agreement. The obligation to provide compensation benefits and the mechanism to contest liability for such benefits are dictated by federal law. Thus, as with the meaning of the labor contract provisions in *Lueck,* federal law and prescribed federal mechanisms must determine the meaning and application of the provisions of the LHWCA.

Further, the instant case provides a stronger argument for preemption than did *Lueck.* In *Lueck,* the state court tort action arose from an interpretation of a privately negotiated agreement, some of whose substantive provisions were not dictated by federal law. Here the collision between Congress and the state court arises not from a contract negotiated under the auspices of the Act but from the terms of the Act itself.

### Fifth Differs with First

In support of his position that his state tort claim is not preempted, Jackson urges us to adopt the reasoning of *Martin v. Travelers Insurance Co.,* 497 F.2d 329 (1st Cir.1974). In *Martin,* an LHWCA claimant brought a common law claim for infliction of emotional distress against the LHWCA carrier in federal court. The facts in *Martin* were particularly egregious. The claimant had received three LHWCA compensation checks, which he deposited and drew against. The insurer, evidently deciding to appeal, stopped payments on the checks. Claimant had no knowledge of the stop order. The result was financial hardship and emotional distress to the claimant.

The court held that the claimant's cause of action was not preempted. It read the exclusivity provision in § 5 of the Act, 33

U.S.C. § 905, as applying only to injuries arising from the employee's injury or death, but not to a cause of action arising out of the manner in which compensation payments are made. The court in *Martin* also read § 5 to limit only the liability of an employer, not an employer's insurer.

As we stated above, we read the exclusivity language in § 5 broadly in order to effectuate the comprehensive statutory compensation scheme contained in the Act. *See LeSassier v. Chevron USA, Inc.,* 776 F.2d 506 (5th Cir.1985) (simply because retaliatory discharge provision of LHWCA is not included in LHWCA's exclusivity provision does not mean that plaintiff was free to bring retaliatory discharge claim under state law). As we also stated above, we read the Act so that the rights and obligations of the employer's insurer are congruent with those of the employer. *See* 33 U.S.C. § 935; 20 C.F.R. § 703.115. We further believe that the Supreme Court's 1985 decision in *Lueck* effectively refutes the reasoning behind the *Martin* decision. Therefore, with deference, we decline to follow the First Circuit lead.

### McCarran No Obstacle

Jackson also argues that the McCarran Act, 15 U.S.C. §§ 1011–1015, leaves to the states the business of regulating insurance, including the business of determining the manner in which insurance payments are made. Section 1012(b) of Title 15 states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."

Insofar as the matters presented in the instant case are concerned, we hold that the LHWCA "specifically relates to the business of insurance" and thus falls outside the area left to the exclusive regulation of the states. Numerous provisions of the LHWCA relate specifically to insurance carriers, and through § 35 of the Act, 33 U.S.C. § 935, the duties imposed upon employers are deemed imposed upon the

insurers of employers. *See also* 20 C.F.R. § 703.115. The regulations implementing the LHWCA address at length the insurers' obligations under the Act. *See* 20 C.F.R. § 703. This level of regulation of insurance carriers leaves no doubt that the LHWCA "specifically relates to the business of insurance."

In light of each of the above considerations, we conclude that Jackson's Texas state law claims are precluded by the LHWCA. Jackson's exclusive remedy for failure to pay his claims arises under the LHWCA. We therefore affirm the District Court in holding Jackson's state law claims to be preempted.

### Enjoined from Enjoining

■ The District Court concluded that Jackson's state law claims were preempted by the LHWCA, and permanently enjoined Jackson from proceeding with those claims in state court. In light of controlling Supreme Court precedent, however, we vacate the injunction, holding that it violates the Anti-Injunction Act, 28 U.S.C. § 2283.

The Anti-Injunction Act states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except [i] as expressly authorized by Act of Congress, or [ii] where necessary in aid of its jurisdiction, or [iii] to protect or effectuate its judgments."[7] The District Court held that the injunction issued in this case was authorized by the first and third of the stated exceptions. Jackson challenges the issuance of the injunction as contrary to established case law. We agree.

### (i) Expressly Authorized by Congress

■ The standard for determining when an injunction of a state court proceeding is "[i] expressly authorized by Act of Congress" is laid out in *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1971). The statutory authorization need not refer expressly to § 2283, *Amalgamated Clothing Workers v. Richman Bros. Co.*, 348 U.S. 511, 516, 75 S.Ct. 452, 455, 99 L.Ed. 600, 608 (1955), nor need it expressly

authorize an injunction of a state court proceeding, *Mitchum*, 407 U.S. at 237, 92 S.Ct. at 2159, 32 L.Ed.2d at 714. "[A]n Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding.... The test is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Id.* at 237–38, 92 S.Ct. at 2159–60, 32 L.Ed.2d at 714–15 (footnote omitted).

*Mitchum* was a civil rights case brought under 42 U.S.C. § 1983. After undertaking a review of the legislative history of that statute, the Supreme Court found that injunctive power was necessary to ensure that § 1983 be given its intended scope of protecting the civil rights of citizens in their state courts.

A similar inquiry was made in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). Although *Lektro-Vend* in some ways muddled the "expressly authorized" doctrine, it did reemphasize the importance of legislative history in finding such an exception. In *Lektro-Vend*, the plurality opinion determined that the legislative history of the Clayton Act did not demonstrate that Congress intended for the injunctive relief provision of the Clayton Act to constitute an express exception to the Anti-Injunction Act.

■ The law is clear that a federal court cannot enjoin a state court proceeding "merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 294, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234, 245 (1970). "This rule applies regardless of whether the federal court itself has jurisdiction over the controversy

**7.** We have inserted the brackets in the statutory language for the convenience of reference.

or whether it is ousted from jurisdiction for the same reason that the state court is." *Id.* at 281–82.

■ A distillation of these cases, thus, yields this rule: to justify finding that a statute contains an expressly authorized exception to the Anti-Injunction Act, a court must first find that Congress explicitly recognized that state courts would, or would be used by others to, invade areas protected by federal law and second, that the only way to give the federal law its full meaning and scope is to enjoin such state court proceedings.

The District Court made no findings on the first prong. It instead focused only on the primacy of a national, uniform scheme of LHWCA coverage, equating that concern with the "full scope" element. The proper inquiry would have been whether Congress recognized that the state courts would so frustrate or destroy the LHWCA's objective that the statute's full scope could be achieved only by enjoining state actions. That inquiry was not made. The District Court's emphasis on the national uniformity of the LHWCA is relevant to a determination of preemption, which we have affirmed. By its own force, however, that determination cannot then properly be extrapolated into an express authorization exception under the Anti-Injunction Act. Accordingly, the District Court erred in so holding.

### (iii) To Protect or Effectuate Judgments [8]

The District Court also held that its injunction was authorized by § 2283 as one necessary "[iii] to protect or effectuate [the] judgments" of the federal courts.

According to the District Court, the federal courts' judgment to be protected in this case was the final decision of the ALJ granting compensation, plus interest and attorney's fees, to Jackson. The District Court held the award of attorneys' fees and interest to be a "penalty" against TEIA, and res judicata as to wrongful withholding claims. The court held that the fee award precluded all litigation of TEIA's liability for its questionable handling of the claim, including the pending state case. We disagree. The issues alleged in state court of bad faith, fraud, infliction of emotional distress, *et al.* were simply not before the ALJ. A finding of res judicata on these issues based on the ALJ's final order is unfounded.

■ The relitigation exception is construed narrowly.[9] It authorizes injunctions on matters that have been finally decided by a federal court. Res judicata may also bar state litigation on a part of the claim that could have been, but was not, determined in the federal case.

The issues charged in the state court case, unrelated directly to Jackson's waterfront injury, were not before, and thus not decided by, the ALJ. Res judicata is applicable in an administrative proceeding [10] only when "an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate." *United States v. Utah Construction Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642, 661 (1966). *See also, United States v. RCA*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

In this case, TEIA, bearing the burden of establishing exception (iii) of the Act, made

---

**8.** The second exception (ii) to the Anti-Injunction Act, "necessary in aid of jurisdiction" was not relied upon by the District Court, and has not been urged by Jackson on appeal.

**9.** *See, e.g., In Re Corrugated Container Antitrust Litigation,* 659 F.2d 1332 (5th Cir.1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982); *Bank of Heflin v. Miles,* 621 F.2d 108 (5th Cir.1980); *Seaboard Coast Line Railroad Co. v. Union Camp Corp.,* 613 F.2d 604 (5th Cir.), *cert denied,* 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980).

**10.** We leapfrog the initial hurdle, over which the parties have argued vigorously, of whether a final agency order, reviewable in federal court, can constitute a "judgment of a federal court" for purposes of § 2283. Resolution of that issue is not essential for our decision. The delicate balancing required in such an inquiry is better suited to a case squarely presenting and turning on that issue.

no showing that there was any litigation of these state claims or issues before the ALJ. The fact that, unopposed by TEIA, the ALJ made an award of costs and fees—items precisely allowable under the LHWCA—to Jackson, is not by any stretch a "final determination" on the issues of bad faith or fraud.[11] Whether the LHWCA preempts any court, federal or state, from hearing and determining Jackson's tort claim is not the pertinent inquiry here. Preemption is not equal to res judicata. We are concerned rather with the question whether an award of interest and fees can be spun into a fully litigated issue of bad faith eligible for the relitigation exception to the Anti-Injunction Act. We hold that it cannot.

We recognize that a finding of preemption coupled with an inability to coercively enforce that finding is paradoxical, to say the least. Nevertheless, it is only emblematic of the prized value we have historically place on the principles of federalism and comity.[12]

**11.** The sum total of attention the ALJ devoted to this "litigated" issue is as follows: *"Attorney Fees.* Claimant's counsel's fee petition requesting $6,250.00 for 50.50 hours of legal services rendered since referral to this Office has been received, plus $790.51 in costs. Respondents have not advised they object to the petitioned fee. Therefore the fee requested is approved plus costs." ALJ Order, 9/24/84 (Record at 19). The award was not expressly made pursuant to any statute, although §§ 928(a) & (b) permit such an award.

**12.** Since the District Court granted the injunction, the Supreme Court decided a case bearing on the relitigation exception. In *Parsons Steel v. First Alabama Bank,* 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986), the Court held that once the state court has expressly rejected a claim of res judicata, the Full Faith and Credit Act, 28 U.S.C. § 1738, bars a federal court from enjoining a state action in order to protect a prior federal judgment.

In this case, TEIA filed a plea in bar in state court. The state court held a special hearing on TEIA's motion, and rejected it. The state case, however, was enjoined before going to trial and final judgment. Thus, the effect of *Parsons Steel* on the instant case is unclear. *Parsons Steel* is limited to issues in which "the state court has *finally rejected* a claim of res judicata." 474 U.S. at ——, 106 S.Ct. at 772, 88 L.Ed.2d at 884 (emphasis added). Whether the state court's rejection of TEIA's res judicata argument was "final" enough—even though the

*Federal Question Jurisdiction: Present and Accounted for*

■ As we have discussed, none of the three exceptions to the Anti-Injunction Act are clearly available in this case. Accordingly, we defer to the time-honored rule that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting state courts to proceed in an orderly fashion to finally determine the controversy." *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 297, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234, 246–47 (1970). As our foregoing discussion demonstrates, to determine whether a federal court injunction could be granted, it was necessary that we first determine the underlying question of preemption by the LHWCA. We therefore affirm the District Court's declaratory judgment[13] that Congress has preempted

case had not gone to trial—to serve as an independent bar to the relitigation exception is a question of state law. *See, e.g., Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 385 (Tex.1985) ("test for finality is whether the conclusion in question is procedurally definite and subject to appeal."); *Green Oaks Apts., Ltd. v. Cannan,* 696 S.W.2d 415, 418 (Tex.Ct. App.1984) (only final judgment can support plea of res judicata); *Whitmire v. Kriegel,* 678 S.W.2d 567, 569 (Tex.Ct.App.1984) (same).

The District Court ignored the state court's rejection of TEIA's res judicata claim. Nevertheless, since we have already found that the ALJ did not adjudicate the bad faith claims, we need not reach the issue of the retroactive effect of *Parsons Steel* on the District Court's action. The bearing of *Parsons Steel* on the propriety of granting declaratory relief is discussed *infra.*

**13.** The language of the District Court's declaration is as follows:

The action of the Defendant presently pending in the State of Texas District Court of Jefferson County, which asserts various theories of recovery based upon the manner in which the Plaintiff handled Defendant's claim for compensation and other benefits under the Longshore and Harbor Workers' Compensation Act ("the Longshore Act") 33 U.S.C. § 901, et seq., is preempted by the Longshore Act. Any remedy Defendant may have for the alleged conduct of the Plaintiff in handling that claim is restricted to the recoveries provided for in the Longshore Act.

Record at 223–24.

the entire field of compensation awarded under the LHWCA.

At this point, we wish to address certain issues that may be raised concerning our jurisdiction. We recognize that although this area of law may not be crystal-clear, the Supreme Court recognizes that there is room for disagreement. For example, one possible argument is that this case raises the evil spectre of the well-pleaded complaint rule. And indeed, there is language in some cases lending support for that contention. In *Louisville & Nashville Railroad Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), the Supreme Court held that a federal court cannot take jurisdiction of a case as one "arising under" federal law if the federal issue will be raised only as a defense to the opposing party's state law claim.

The well-pleaded complaint rule has been knitted into the Declaratory Judgment Act, although not without dropping a stitch or two. As one thoughtful commentator explains, "the effect of the well-pleaded complaint rule in preemption cases is complicated. *Mottley* presented a situation in which the plaintiff sued under state contract law and the defendant relied on preemption as a defense. In this case, the Court understandably treated preemption as a defense to a state-law claim. The result is not quite so understandable in declaratory judgment actions, in which the *Mottley* rule has been applied to bar suits presenting preemption claims raised by plaintiffs." Note, *Federal Jurisdiction Over Preemption Claims: A Post-*Franchise Tax Board *Analysis*, 62 Tex.L.Rev. 893, 898 n. 40 (1984).

In the past, *Mottley* and the well-pleaded complaint rule have often acted to defeat jurisdiction in declaratory judgment actions. *See Merrell Dow Pharmaceuticals Inc. v. Thompson*, — U.S. —, —, 106 S.Ct. 3229, 3235, 92 L.Ed.2d 650, 661 (1986) ("the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction"); *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 16, 103 S.Ct. 2841, 2850, 77 L.Ed.2d 420, 435 (1983) (" 'if, but for the availability of the declara-

tory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking.' "), quoting 10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2767 at 744–45 (2d ed. 1983); *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242–43, 97 L.Ed. 291, 298 (1952) ("it is doubtful if a federal court may entertain an action for declaratory judgment establishing a defense to [a pending or threatened state based] claim"); *Powers v. South Central United Food & Commercial Workers Unions*, 719 F.2d 760, 764 (5th Cir.1983) ("an asserted or anticipated defense predicated on federal preemption of state law is, in jurisdictional terms, a defense like any other and will not serve to invoke federal jurisdiction").

We feel certain, however, that this negative characterization is dispelled by a proper review of the case law. To begin with, we point out another analogy to the Labor Management Relations Act. (See discussion of LMRA and *Lueck* case, *supra*.) In *Avco Corp. v. Machinists*, 376 F.2d 337 (6th Cir.1967), *aff'd*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), the plaintiff employee filed suit in state court alleging that the defendant union had breached its "contract" by sanctioning work stoppages. The employee sought temporary and permanent injunctions. Clearly, the plaintiff had a federal cause of action under § 301 of the LMRA, if he desired it. The union then sought to remove the case to federal court, over the employee's objections.

The court of appeals held, and the Supreme Court affirmed, that the employee's action "arose under" § 301, and thus the union's motion to remove the case to federal court was proper. (The removal statute, like the declaratory judgment statute, is procedural and derivative only. An independant basis of jurisdiction must be established in either removal or declaratory judgment actions.) The necessary ground of decision in *Avco* was that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violations of contracts between an employer and a labor organization.... Any such suit is purely a creature of federal

law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.... *Avco* stands for the proposition that if a federal cause of action completely preempts a state cause of action, any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." *Franchise Tax Board*, 463 U.S. at 23–24, 103 S.Ct. at 2853, 77 L.Ed.2d at 440.

In addition, we have a bright new lodestar to guide our course. In a very recent decision, the Supreme Court has continued the trend begun nearly 20 years ago in *Avco*. In *Metropolitan Life Ins. Co. v. Taylor*, —— U.S. ——, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), the Court affirmed the vitality of *Avco* and extended the *Avco*-LMRA exception to analogous ERISA cases. After setting out the general nature of the well-pleaded complaint rule, the Court states

> One corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-exempt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character. For 20 years [since *Avco*], this Court has singled out claims preempted by § 301 of the Labor Relations Management Act for such special treatment.

. . . .

The question thus resolves itself into whether or not the *Avco* principle can be extended to statutes other than the LMRA in order to recharacterize a state law complaint displaced by § 502(a)(1)(B) [the section conferring private causes of action under ERISA] as an action arising under federal law.

—— U.S. at ——, 107 S.Ct. at 1546–47, 95 L.Ed.2d at 63.

To answer that question, the Court resorted to a comparison of the legislative history of ERISA and the LMRA. Focusing on similar language in the statutes' enforcement provisions, and emphasizing that both are broad labor law acts, the Court found with little difficulty, that Congress has conferred federal jurisdiction in cases with such overarching federal, legislatively declared, interests. Accordingly, the Court concluded that *Taylor*, although "purport[ing] to raise only state law claims, is necessarily federal in character by virtue of the clearly manifested intent of Congress." *Id.* at ——, 107 S.Ct. at 1548, 95 L.Ed.2d at 65.[14]

Our question, then, is whether the LHWCA is powerful enough to satisfy the principle of *Avco* and *Taylor*: stated differently, is the Longshore Act entitled to the same federal protection as are the LMRA and ERISA. It is a question easily answered in the affirmative. The Court focuses on the "explicit direction" from Congress—both in statute and legislative history—that demonstrates its intent utterly to "displace" state law in establishing federal question jurisdiction.[15] As we have set out

---

**14.** Only a few illustrations are necessary to reveal how pervasive is the LHWCA and how destructive an interference are Jackson's state asserted claims. For example, in Paragraph VII of Jackson's state court complaint, Jackson purports to invoke Article 21.21 of the Texas Insurance Code in pleading that "three times the amount of actual damages be awarded as a matter of law." Yet § 905 of the LHWCA provides that the liability prescribed under the Act "shall be exclusive and in place of all other liability...."

Jackson also abrogates the congressionally established scheme of LHWCA economic rights and limitations in Paragraph XIV of his complaint. There, he invokes the Texas Deceptive Trade Practices Act seeking "as a matter of law [that] damages be trebled."

**15.** One indicator utilized by the Supreme Court to establish such a power of displacement is whether Congress has conferred a private cause of action. *See Avco* 390 U.S. at 560, 88 S.Ct. at 1237, 20 L.Ed.2d at 129; *Taylor*, —— U.S. at ——, 107 S.Ct. at 1547, 95 L.Ed.2d at 63. By contrast, in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, —— U.S. ——, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), the Supreme Court rejected the argument that a state-based claim arose under federal law because the state law incorporated its standard of care from a federal statute, which itself provided no private cause of action. *See also, Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89 (5th Cir.1986) (dispute over private contract incorporating federal regulation does not create federal-question jurisdiction).

Unlike the federal Food, Drug and Cosmetic Act at issue in *Merrell Dow*, the LHWCA pro-

above, in some detail, the LHWCA, springing originally from the impeccably federal province of admiralty jurisdiction, has continued, unquestioned through fifty years of congressional monitoring, to remain squarely under the protection of federal jurisdiction. A review of the LHWCA and its legislative history yields at least as strong "explicit direction." Even without such "explicit direction," however, the Court recognizes that federal-question jurisdiction might still be available, although concededly a closer question.

Our determination that the LHWCA is so preemptive as to create federal question jurisdiction is no "expansion" of the *Avco* rule. The LHWCA, if anything, is broader, and more comprehensive than the LMRA. As we mentioned in our discussion of *Lueck*, § 301 of the LMRA merely places jurisdiction of labor disputes in the federal district courts. The LHWCA, on the other hand, contains not only the exclusive remedy section (§ 905(a)), but also sets out sections and chapters that comprehensively regulate employers and insurance carriers that provide LHWCA coverage, and utterly control the sum total of rights and obligations of insurers, employers and employees. We, by no means, then, are "diluting" the *Avco* rule; we are acknowledging an exception more powerful than the original. *See also, Taylor*, —— U.S. at —— ——, 107 S.Ct. at 1548, 95 L.Ed.2d at 65 (Brennan, J., concurring).

Accordingly, we hold that federal question jurisdiction is present here, and declaratory relief may properly be considered.

*Declaratory Judgment—Not a Forbidden Injunction*

 We recognize that this declaration, to a certain extent, raises conceptually some questions regarding the *Younger v. Harris* line of cases.[16] We decline, however, to circumscribe the perimeter of this purely civil matter precisely along the fence erected against federal intervention in state criminal cases. Rather, we take our cue from Justice Brennan's opinion for a unanimous Court in *Steffel*. Although his comments were directed to the distinction between injunctive and declaratory relief in criminal matters, we find much of his opinion instructive on the propriety of the gentler relief of declaratory judgment in civil preemption matters. "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction.... [E]ven though a declaratory judgment has 'the force and effect of a final judgment', it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; non-compliance with it may be inappropriate, but it is not contempt." *Steffel*, 415 U.S. at 466, 471, 94 S.Ct. at 1219, 1221, 39 L.Ed.2d at 519, 521, *citing Perez v. Ledesma*, 401 U.S. at 124–26, 91 S.Ct. at 696–98, 27 L.Ed.2d at 728–29 (separate opinion of Brennan, J.). *Steffel* also makes clear that a showing of irreparable injury—a traditional prerequisite to injunctive relief, having no equivalent in the law of declaratory judgments,—is unnecessary in an action for declaratory judgment.[17] *Steffel*, 415 U.S. at 471–72, 94 S.Ct. at 1222, 39 L.Ed.2d at 521–22.

vides an exclusive means by which to challenge, and recover for, wrongful controversion. *See* 33 U.S.C. §§ 905, 914. *Merrell Dow* explicitly restricted its holding to cases where no federal cause of action could be maintained for the injury. *See Merrell Dow* at ——, 106 S.Ct. at 3234, 92 L.Ed.2d at 660 ("The significance ... that there is no federal private cause of action [under the FDCA] thus cannot be overstated").

**16.** Beginning with *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 669 (1971), *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), and continuing through the more recent cases of *Steffel v.*

*Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), and *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the Supreme Court has redefined and clarified the edges of a federal court's proper jurisdiction in rendering declaratory judgments on pending or threatened state actions in criminal (or closely related enforcement) cases.

**17.** Mr. Jackson makes much of the irreparable injury argument in his briefs. By considering declaratory relief only, however, we need not reach this issue.

Simply stated, a civil declaratory judgment is not a whole different kettle of fish from a criminal declaratory judgment; it is, rather, a kettle of fish stew seasoned with a set of private interests distinct from the concerns at issue in a state criminal proceeding.[18]

■ Bearing in mind the instructive teaching of *Steffel*, we now approach the declaratory judgment. Clearly, there is an "actual controversy" between the parties: there is a pending trial. The parties have adverse legal interests and are positioned adversarily. We have already determined that an independent basis of jurisdiction, that is, federal question jurisdiction, exists. And finally, the issues in controversy between the parties remain very much alive.[19]

■ While it is true that the pendency of a state court proceeding is a proper basis for a federal court to decline to issue a declaratory judgment, *PPG Industries, Inc. v. Continental Oil Co.*, 478 F.2d 674, 677 (5th Cir.1973), neither statutory nor case law mandates such refusal. *See Western Casualty & Surety Co. v. Teel*, 391 F.2d 764, 766 (10th Cir.1968) ("Courts should not be deterred from giving full force and effect to the purpose of the Declaratory Judgment Act."); *Travelers Indemnity Co. v. Winmill*, 294 F.Supp. 394, 397 (D.Minn.1968) (spirit of the Declaratory Judgment Act counsels a practical approach in exercising discretion: "Problems should be appraised in the light of common sense, having regard to federal-state relations, comity between courts of concurrent jurisdiction, the potentials of the respective systems for expert and comprehensive solution, and factors such as cost and convenience to the public as well as to the parties."); *Wong v. Bacon*, 445 F.Supp. 1177,

1186–87 (N.D.Cal.1977), *cited in Franchise Tax Board*, 463 U.S. at 22 n. 24, 103 S.Ct. at 2853 n. 24, 77 L.Ed.2d at 438 n. 24 (federal declaratory relief proper on a preemption claim, even though state court proceeding already pending).

In our earlier discussion under (iii) the relitigation exception to the Anti-Injunction Act, we held it unnecessary to reach the issue of the retroactive effect of *Parsons Steel* on the state court's rejection of TEIA's plea in bar.[20]

Here, however, we must address directly the implications of the Full Faith and Credit Act, 28 U.S.C. § 1738, from the standpoint of *Parsons Steel*. In Jackson's case, the state court held a special hearing on TEIA's plea in bar. The parties briefed the issue, and the court heard oral argument. The state court then rejected the claim, and set the case for trial.

■ *Parsons Steel* speaks in terms of "issues" being finally decided. 474 U.S. at ——–——, 106 S.Ct. at 771–73, 88 L.Ed.2d at 883–84. Although this implies that a state court need not have rendered a truly final judgment on the case as a whole in order for res judicata and full faith and credit to come into play, it certainly means that the judicial order—opinion or otherwise—at issue must be one which the state court regards as final and beyond recall by the court issuing it. *See* Restatement (Second) of Judgments § 13 comment g (1982).

■ Thus, if the state court's ruling was a "final" one, we ourselves are bound by that determination. Unlike our earlier discussion, in which we declined to find *Parsons Steel* sufficient to affirmatively support an injunction on issue relitigation, here it assumes negative significance. A federal declaratory judgment, issued subsequent to the state's ruling, would violate

---

**18.** One commentator posits this argument: "[T]he delicate balance of comity symbolized by the Tenth Amendment is much less endangered by federal jurisdiction over private suits than by jurisdiction over public suits. A rule that allows a federal District Court to take jurisdiction over a suit between private parties seeking a declaration that a state law is preempted—regardless of who raises the preemption issue—might even ease the tension between the state and federal judicial systems. Fewer conflicts would be resolved in proceedings in which a state was

forced to justify its own laws to a federal district judge. These issues would be resolved instead in suits between private parties." *Note,* 62 Texas L.Rev. at 917.

**19.** *See generally* 6A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 57.11 (2d ed. 1986).

**20.** See discussion *supra* at n. 9.

the Full Faith and Credit Act as construed in *Parsons Steel.* "[A] federal court must give the same preclusive effect to a state court judgment as another court of that state would give." *Parsons Steel,* 474 U.S. at ——, 106 S.Ct. at 771, 88 L.Ed.2d at 883, *citing Migra v. Warren City Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).

We thus review Texas state law to determine first, how "final" its courts would consider the state judge's ruling, and second, to what preclusive effect it is entitled.

■■■ A recent Texas Supreme Court case ends our search. In *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381 (Tex.1985), the supreme court adopted the Restatement (Second) of Judgments (1982) to determine issues like ours. The supreme court focused on "whether the conclusion in question was procedurally definite ... and was subject to appeal or was in fact appealed." 697 S.W.2d at 385. Obviously, "subject to appeal" is in terms of whether the order under scrutiny was itself then and there—with no necessity for further trial or judgment on the merits— could be appealed. The state court's ruling in Jackson's case was an interlocutory order. "It is Texas law, long established, that only those interlocutory decrees that are specifically made so by statute are appealable." *General Box Co. v. Southwest Subsidiary Co.,* 598 S.W.2d 662, 663 (Tex. Civ.App.1980). *See* also *Hunt Oil Co. v. Moore,* 639 S.W.2d 459 (Tex.1982). Denial of a plea in bar is not an appealable interlocutory judgment under Texas law. Therefore, we hold that, since another Texas court would not consider this order "finally decided", neither should we accord it preclusive effect under full faith and credit. Our inquiry under *Parsons Steel* is satisfied.

### Tail End of the Tale

We do not direct state courts. We do not today presume to decide cases or issues for them. They are as competent as we. Our determination today is valid for res judicata purposes as between these parties and as stare decisis in the Federal Courts of the Fifth Circuit. Although our judgment (and that of the District Court) has no coercive effect, we have no doubt that the Texas courts will, as always, accord full weight to the determination of a federal court having jurisdiction over the parties, speaking in terms of the application of a federal statute.

**AFFIRMED IN PART, VACATED IN PART.**

EDITH H. JONES, Circuit Judge, dissenting:

In their zeal to hold that the Longshoremen and Harbor Workers Compensation Act (LHWCA) is the exclusive remedy for Jackson, the majority have seriously erred in several facets of their analysis. Most critically, they conclude that we have jurisdiction over this action despite the obvious applicability of the well-pleaded complaint rule. The only basis of our jurisdiction is TEIA's federal defense, alleging preemption of state remedies by the LHWCA, to Jackson's claim for state law relief. A prior Fifth Circuit panel has disclaimed jurisdiction in a closely analogous case involving LHWCA, but the majority do not acknowledge its controlling effect.

The majority's rush to protect the supremacy of the federal compensation scheme has also led to an ungainly spectacle: a federal court's umpiring an ongoing lawsuit in state court. While the Supreme Court has not extended *Younger* abstention principles to all pending state court civil litigation, the majority have misread the analytical framework of the Court's most recent pronouncement on that issue.

### I.

It is a rule almost too well settled to require citation that no federal jurisdiction exists in a declaratory judgment action if a federal question would arise only as a defense to a state cause of action. As stated by the Supreme Court in *Public Service Commission of Utah v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952):

Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine

whether there is federal-question jurisdiction in the District Court.

"The best-settled application of the well-pleaded complaint rule to actions for a declaratory judgment is that federal question jurisdiction exists of a declaratory action if the plaintiff could have sued in federal court for coercive relief." 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3566, at 99 (1984). This principle was recently reaffirmed in *Franchise Tax Board of California v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). There, the Court held that federal jurisdiction may not be premised "on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." 463 U.S. at 14, 103 S.Ct. at 2848. *See also Caterpillar, Inc. v. Williams*, — U.S. —, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987) (holding that it is "settled law" that a federal defense to a state law cause of action, including the defense of preemption, is insufficient to establish federal question jurisdiction under the well-pleaded complaint rule).

The majority acknowledge this rule, as well as its applicability here. Jackson's state law complaint contains no operative ingredient of federal law. The LHWCA becomes pertinent only as the basis for TEIA's preemption defense. The majority neglect, however, to address this court's controlling prior decision that the LHWCA does not overcome the well-pleaded complaint rule in a declaratory judgment context.

In *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173 (5th Cir.1984), a declaratory judgment action was instituted by several individuals against Litton, the parent of their shipbuilding employer Ingalls, and Owens-Corning Corporation. The complaint alleged that each of the plaintiffs had previously filed a suit against Owens-Corning for personal injury resulting from exposure to asbestos, which Owens-Corning agreed to settle conditioned on approval

by Litton. Litton declined to give its approval and asserted, as plaintiffs' employer, an independent right of indemnification against Owens-Corning in addition to its LHWCA subrogation rights. Thus, plaintiffs sought a declaration that Litton had no right of indemnification against Owens-Corning and that the right of subrogation under the LHWCA was Litton's exclusive remedy.

Applying the well-pleaded complaint rule, this court concluded that jurisdiction was lacking because "plaintiffs do not assert a cause of action or claim under the LHWCA against Litton, but rather seek declaratory judgment concerning the effect of the LHWCA on claims Litton might otherwise have against Owens-Corning." 723 F.2d at 1179. The court reasoned that it was immaterial "that plaintiffs and Owens-Corning contend that the LHWCA ... bars such an action, *as this is the sort of defensive issue which cannot form the basis of section 1331 jurisdiction.*" *Id.* at 1183 (emphasis added). *Lowe* inescapably requires us to deny jurisdiction over TEIA's declaratory judgment request.

Not to be deterred, the majority attempt to fit TEIA's claim into the exception to the well-pleaded complaint rule recognized in *Avco v. Aero Lodge No. 735*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) which held that the breadth of section 301 of the LMRA displaced state causes of action relating to management/labor relations. Declaring the LHWCA as comprehensive in scope as the LMRA, the majority would effectively transform what would normally be state law claims into claims uniquely federal in character. This argument overlooks that *Avco* represents a virtually unique exception to the well-pleaded complaint rule. The Supreme Court recently reaffirmed that unless Congress unmistakably manifests an intent to make a cause of action removable to federal court, a defense of federal preemption is insufficient to create federal subject matter jurisdiction. *Metropolitan Life Insurance Co. v. Taylor*, — U.S. —, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).[1] *Avco* itself is not an

---

1. *Taylor* admittedly extended the *Avco* exception to hold that state common law claims which are

preempted by ERISA were also displaced by ERISA's civil enforcement provision,

all-encompassing labor-law exception to the well-pleaded complaint rule. The Supreme Court, reiterating its *Metropolitan Life* pronouncement, stated that "the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is master of the complaint, that a federal question must appear on the face of the complaint [i.e. not as a defense], and that the plaintiff may ... choose to have the cause heard in state court." *Caterpillar, Inc. v. Williams,* 107 S.Ct. at 2433. Thus, the Court concluded, a state court may interpret § 301 and a federal collective bargaining agreement whose terms are raised in defense to plaintiffs' state law action for an alleged employment contract breach. Likewise, we are bound by the formidable and "settled" well-pleaded complaint doctrine to reject TEIA's search for shelter in a federal forum. TEIA may obtain resolution of its federal law issues in state court, with review by the Supreme Court if necessary.

## II.

Having discussed the dispositive question, I must nevertheless take issue with two additional portions of the majority opinion. First, the discussion of abstention by the majority appears to be a "strawman" erected to defer attention from the more significant question whether granting declaratory relief would in this case violate, in letter or in spirit, the Anti-Injunction Act, 28 U.S.C. § 2283. Second, to the extent *Younger* [2] abstention principles are applicable to non-§ 1983 cases, I disagree with the majority's cavalier treatment of these principles in the civil context.

### A.

Although the majority conclude that 28 U.S.C. § 2283 prohibits issuance of injunctive relief, they determine that declaratory relief is not prohibited because the effects of federal intervention are supposedly less intrusive in the declaratory judgment context. Relying on *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505

§ 502(a)(1)(B), thus creating federal question jurisdiction on removal under 28 U.S.C. § 1441(b) of what would otherwise be uniquely state law causes of action. While, on its face, ERISA's civil enforcement provision appears exceptionally broad, the Court was reluctant to extend *Avco* to the civil enforcement framework of ERISA:

Even with a provision such as § 502(a)(1)(B) that lies at the heart of a statute with the unique pre-emptive force of ERISA ... we would be reluctant to find that extraordinary preemptive power, such as has been found with respect to § 301 of the LMRA, that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well pleaded complaint rule. 107 S.Ct. at 1547.

The Court's decision was founded on the virtual identity between the jurisdictional schemes of ERISA, § 502(f), 29 U.S.C. § 1132(f), and the LMRA, § 301, 29 U.S.C. § 185(a), and congressional history explicitly linking those two provisions:

The presumption that similar language in two labor statutes has a similar meaning is fully confirmed by the legislative history of ERISA's civil enforcement provisions. The Conference Report on ERISA describing the civil enforcement provisions of § 502(a) says: "[W]ith respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the Title I provisions, they may be

brought not only in U.S. district courts but also in State courts of competent jurisdiction. *All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947."* H.R.Conf.Rep. No. 93–1280, p. 327 (1974) (emphasis added).

No more specific reference to the *Avco* rule can be expected....

*Id.* Nevertheless, the Court cautioned, "even an 'obvious' preemption defense does not, in most cases, create removal jurisdiction. In this case, however, Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court." *Id.* at 1548.

The LHWCA contains no civil enforcement provision like the Siamese twin provisions found decisive in *Taylor* between ERISA and § 301 of the LMRA. The decisive factor therefore is whether the LHWCA is "so powerful as to displace entirely any state cause of action...." *Franchise Tax Board,* 463 U.S. at 23, 103 S.Ct. at 2853. Congress has not indicated, as it did with ERISA, that the LHWCA reaches this far. Absent a direct expression of legislative intent to create federal jurisdiction for all causes of action related to LHWCA, the well-pleaded complaint rule may not be overcome.

2. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746¢G, L.Ed.2d 669 (1971).

(1974), the majority effectively finesse the limitations of the Anti-Injunction Act and approve declaratory relief whose effect, as res judicata between these parties, will probably terminate the pending state litigation as effectively as would an injunction.

*Steffel,* to borrow a phrase, is a whole different kettle of fish from this case. The Supreme Court's dicta there suggest that "different considerations" affect the decision whether to grant declaratory relief vis-a-vis injunctive relief in that a declaratory judgment is less intrusive to a state's interest in preserving the integrity of its judiciary. What the majority overlook, however, is the critical distinction in *Steffel:* principles of comity and federalism were not implicated in that case *because there was no pending state proceeding.*

The Supreme Court has, however, underscored the proposition that principles of comity and federalism apply with equal weight to federal declaratory judgment actions instituted during the pendency of state criminal proceedings. In *Samuels v. Mackell,* 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971), the Court reasoned that:

> In cases where the criminal proceeding was begun prior to the federal civil suit, the propriety of declaratory and injunctive relief should be judged by essentially the same standards. In both situations deeply rooted and long-settled principles of equity have narrowly restricted the scope for federal intervention, and ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid.

The Court expressed two fundamental concerns over issuing declaratory relief during the pendency of state proceedings. First, the Court questioned whether granting declaratory relief would effectively bootstrap the proscriptions of the Anti-Injunction Act if it later served as the basis for an injunction against those proceedings to "protect or effectuate" the declaratory judgment. 28 U.S.C. § 2283. Second, the Court noted that "even if the declaratory judgment is not used as a basis for actually

issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would." 401 U.S. at 72, 91 S.Ct. at 768. While *Samuels* was decided in the § 1983 context, its lessons are instructive. *Younger, Samuels,* and their abstention progeny developed as an equitable means by which federal courts could abstain from hearing cases which fall within an exception to the Anti-Injunction Act recognized in *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) for § 1983 cases. By analogy, if, as here, *no* exception to the Anti-Injunction statute exists, it would seem inappropriate for the federal court to intrude in ongoing state proceedings solely to issue a Delphic pronouncement to the parties and state court in the form of a declaratory judgment on applicable federal law. *Cf. Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

Professor Wright agrees that generally, "if a declaratory judgment would have essentially the same effect as an injunction, it should be refused if the injunction would be barred by § 2283." 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4222, at 316 (1978). *See also Chandler v. O'Bryan,* 445 F.2d 1045, 1058 (10th Cir.1971); *McLucas v. Palmer,* 427 F.2d 239, 242 (2d Cir.1970); *Glasgow, Inc. v. Noetzel,* 556 F.Supp. 595, 598 (S.D.W.V. 1983). Because we all agree that 28 U.S.C. § 2283 prohibits an injunction in this case, the same concerns therefore should militate against the propriety of issuing a declaratory judgment. By ignoring this issue, the majority have completely undermined the dominant principles of comity and federalism reflected in the Anti-Injunction Act.

**B.**

I also disagree with the majority's declining "to circumscribe the parameter of this purely civil matter precisely along the fence erected against federal intervention in state criminal cases." *Ante* at 1420. In light of *Pennzoil Co. v. Texaco Inc.,* —— U.S. ——, 107 S.Ct. 1519, 95 L.Ed.2d 1

(1987), the majority's conclusion, while apparently facially correct, is derived from inappropriate analysis. The Supreme Court recently held in *Pennzoil* that *Younger v. Harris* bars an injunction against state proceedings "not only when the pending state proceedings are criminal, but also when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." — U.S. at ——, 107 S.Ct. at 1526 (citation omitted). The Supreme Court rebuffed Texaco's quest for an injunction against the application of Texas post-judgment bond requirements on the grounds that (1) the interference with state collection procedures questioned "the very process by which those judgments were obtained" and (2) Texaco had an adequate, albeit unexplored, remedy should it challenge the statute in the state courts. The Court concluded that "proper respect for the ability of state courts to resolve federal questions presented in state court litigation mandates that the federal court stay its hand." — U.S. at ——, 107 S.Ct. at 1527 (footnote omitted).

The breadth of the Court's holding, however, must be gauged by two footnotes. In one, the majority observed that "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." — U.S. at ——, n. 9, 107 S.Ct. at 1526 n. 9. Shortly thereafter, they caution that "[o]ur opinion does not hold that *Younger* abstention is always appropriate whenever a civil proceeding is pending in a state court. Rather, as in *Juidice*, we rely on the State's interest in protecting 'the authority of the judicial system, so that its orders and judgments are not rendered nugatory.'" — U.S. at —— n. 12, 107 S.Ct. at 1527 n. 12 (quoting *Juidice v. Vail*, 430 U.S. 327, 336 n. 12, 97 S.Ct. 1211, 1217 n. 12, 51 L.Ed.2d 376). Two pertinent questions follow from the Court's comments: whether a declaratory judgment could ever

lead to the interference sought to be avoided in *Pennzoil;* and whether *this* declaratory judgment action should be so proscribed. I would disagree with the majority and answer the first question affirmatively, based on *Samuels* and the above-cited portions of the *Pennzoil* opinion. Because the second issue is not briefed or argued, I would defer its resolution. The majority too hastily dismiss the rationale for abstention in the post-*Pennzoil* era.

For the foregoing reasons, I respectfully dissent.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.[*]

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.